Rashad Rasheed vs. Commissioner of Correction
& another.[1]

Suffolk. December 8, 2005. - April 7, 2006.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, & Cordy, JJ.

Constitutional Law, Freedom of religion, Equal protection of laws. Imprison-
ment, Enforcement of discipline. Civil Rights, Availability of remedy,
Coercion. Administrative Law, Agency's interpretation of regulation,
Agency's interpretation of statute, Regulations. Due Process of Law, Prison
regulation. Governmental Immunity.

In a civil action brought by a prisoner alleging that he was unlawfully
    prevented from practicing his Islamic faith by reason of prison policies and
    regulations regarding meals and the possession of personal and religious
    items, a Superior Court judge properly granted summary judgment in favor
    of the defendants on the plaintiff's claim under the free exercise clause of
    art. 46 of the Massachusetts Declaration of Rights and the First Amend-
    ment to the United States Constitution, where the plaintiff did not establish
    that the restrictions imposed by the Department of Correction (department)
    either limited him in the exercise of his religious beliefs or coerced him to
    act contrary to those beliefs [472-474]; and although summary judgment in
    favor of the defendants was not appropriate, on the stated grounds, concern-
    ing the plaintiff's claim for injunctive and declaratory relief challenging
    his denial of Islamic festival meals, given that the department had not
    established that those meals could not be provided through its principal
    vendor [474-475], summary judgment was nevertheless proper on the
    plaintiff's claim for money damages based on qualified immunity grounds
    [478].
A judge properly dismissed a prisoner's claim under the Massachusetts Civil
    Rights Act, G. L. c. 12, §§ 11H, 11I, where the Department of Correction
    policies he challenged were based on legitimate security interests and
    concerns, and where the record was devoid of facts demonstrating threats,
    intimidation, or coercion applied in connection with those policies.
    [475-477]
A prisoner failed to demonstrate that a prison handbook establishing guidelines
    with respect to religious articles and religious programs and services, as
    applied to him, violated any applicable statute or constitutional provision.
    [477-478]
Evidence in the record of a civil action brought by a prisoner alleging viola-
    tion of the equal protection and due process clauses of the Fourteenth
    Amendment to the United States Constitution in the practice of his religion
    was insufficient to make out a claim, where the prison's restrictions on the

[1]Superintendent of the Souza-Baranowski Correctional Center.

type and amount of personal property an inmate may possess were reasonably related to the penological goals of safety and security, and where the prisoner failed to show that he was subject to disparate treatment, or that any differences in his treatment were the result of discriminatory intent. [477-478]

CIVIL ACTION commenced in the Superior Court Department on December 19, 2000.

The case was heard by *Janet L. Sanders*, J., on motions for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.

*Neil McGaraghan (Jennifer L. Stewart & Carol E. Head* with him) for the plaintiff.

*Richard C. McFarland* for Commissioner of Correction.

*Derek L. Gaubatz*, of the District of Columbia, *Lisa Pirozzolo, & Steven P. Lehotsky*, for Becket Fund for Religious Liberty & another, amici curiae, submitted a brief.

CORDY, J. Rashad Rasheed, a practicing member of the Nation of Islam, a subsect of the Muslim faith that follows the teachings of Elijah Muhammad, has been an inmate in the custody of the Department of Correction (department) since 1975. In December, 2000, he commenced this action against the Commissioner of Correction, and the superintendent of the Souza-Baranowski Correctional Center (SBCC) (a maximum security prison where Rasheed was incarcerated from 1988 to 2003) seeking declaratory and injunctive relief, and money damages for violations of the Fourteenth Amendment to the United States Constitution; 42 U.S.C. § 1983 (2000); various articles of the Massachusetts Declaration of Rights; art. 46 of the Amendments to the Massachusetts Constitution; the Massachusetts Civil Rights Act, G. L. c. 12, § 11H and 11I; and G. L. c. 127, §§ 32 and 88. Central to each of his claims is the allegation that Rasheed was unlawfully prevented from practicing his Islamic faith by reason of prison policies and regulations regarding meals and the possession of personal and religious items.

In December, 2004, the defendants moved for summary judgment and so did Rasheed. A judge in the Superior Court allowed the defendants' motion, denied Rasheed's cross motion,

and dismissed his complaint in its entirety. In concluding that Rasheed's claims failed as a matter of law, the judge first reviewed the effects of the policies and regulations on Rasheed's right to freely exercise his religion. With respect to all but one of the deprivations complained of, the judge concluded that the effect on Rasheed's right was not sufficiently burdensome to warrant further judicial inquiry or relief. With respect to the department's limitation on the food available to him for consumption at two annual religious feasts, however, the judge assumed the burden to be substantial, and proceeded to analyze it under the standard set forth by the United States Supreme Court in *Turner* v. *Safley*, 482 U.S. 78, 89-91 (1987). See *O'Lone* v. *Estate of Shabazz*, 482 U.S. 342, 348, 349 (1987) (applying *Turner* standard in analysis of inmate's free exercise claim). Under this standard, a prison regulation that burdens an inmate's constitutional right is valid so long as it is "reasonably related to legitimate penological interests." *Turner* v. *Safley, supra* at 89. Finding that the limitation was based on valid penological reasons (the prevention of smuggling contraband and inmate jealousies), the judge upheld it, concluding that the limitation struck "an appropriate balance between the needs of individual inmates and the institution as a whole."

We agree with most of the judge's assessment of the case, but conclude that the Massachusetts Constitution is more protective of the religious freedoms of prisoners than the United States Constitution, and that the proper standard of review to be applied to the infringement of such freedoms is consequently more demanding. In determining the constitutionality of department regulations and policies that burden the free exercise of religion by those in its custody, we will look to whether those regulations and policies advance compelling State interests, and, if so, are "tailored narrowly in pursuit of those interests." *Attorney Gen.* v. *Desilets*, 418 Mass. 316, 321 n.4 (1994). Applying this standard leads us to a different conclusion with respect to the religious meals of which Rasheed claims he was denied. Summary judgment on claims that sought declaratory and injunctive relief on that basis is reversed. In all other respects, including the money damages claimed against the individual defendants, summary judgment is affirmed.

A. *The Constitutional Standard.*

The Massachusetts Constitution broadly protects the rights of individuals to exercise their religious beliefs freely. Article 2 of the Massachusetts Declaration of Rights ensures that no person "shall be hurt, molested, or restrained, in his person, liberty, or estate, for worshipping GOD in the manner and season most agreeable to the dictates of his own conscience, or for his religious profession or sentiments." Article 46, § 1, of the Amendments to the Massachusetts Constitution (in language similar to that contained in the First Amendment to the United States Constitution) further provides that "[n]o law shall be passed prohibiting the free exercise of religion." And, of most importance to the question presented in this case, art. 46, § 4, affirms that inmates of publicly controlled penal institutions are not to be deprived of the "opportunity of religious exercises therein of [their] own faith."[2] Taken together, these provisions of our Constitution are intended to guarantee "the free exercise of religion by every citizen, especially protecting the religious liberty of the inmates of penal and charitable institutions." R.L. Bridgman, Massachusetts Constitutional Convention of 1917, at 34 (1923) (statement of the committee on the Declaration of Rights in support of the adoption of art. 46). See *Society of Jesus of New England* v. *Boston Landmarks Comm'n*, 409 Mass. 38, 41 (1990), quoting *Opinion of the Justices*, 214 Mass. 599, 601 (1913) (Massachusetts Constitution "in emphatic and unmistakable terms . . . guarantees to all our people absolute freedom as to religious belief and liberty unrestrained as to religious practices").

---

[2]The full text of art. 46, § 4, is: "Nothing herein contained shall be construed to deprive any inmate of a publicly controlled reformatory, penal or charitable institution of the opportunity of religious exercises therein of his own faith; but no inmate of such institution shall be compelled to attend religious services or receive religious instruction against his will, or, if a minor, without the consent of his parent or guardian." This constitutional right is incorporated into and expanded on in G. L. c. 127, § 88, which in relevant part, provides that an inmate "shall not be denied the free exercise of his religious belief and the liberty of worshipping God according to the dictates of his conscience in the place where he is confined." The statute further provides, however, that it "shall not be so construed as to impair the discipline of any such institution so far as may be needful for the good government and the safe custody of its inmates."

We have previously held that the scope of protection afforded the right to freely exercise one's religion under the Massachusetts Constitution is greater than that afforded by the United States Constitution. *Attorney Gen.* v. *Desilets, supra* at 321. While we have adopted the *Turner* standard of scrutiny for the review of regulations that infringe on other First Amendment rights in the prison context, see *Massachusetts Prisoners Ass'n Political Action Comm.* v. *Acting Governor*, 435 Mass. 811 (2002) (free speech and association), we have yet to rule on whether that standard applies to the infringement of the exercise of religious beliefs. In our view, it does not. We will not ignore the explicit attention our Constitution gives to the application and extension of the right of religious exercise to inmates, an attention given no other right or liberty. The standard to be applied is the standard articulated in *Attorney Gen.* v. *Desilets, supra.*

In applying this standard to the department's policies and regulations at issue here, the *Desilets* case directs that we first determine whether Rasheed has shown that those policies or regulations substantially burden the free exercise of his sincerely held religious beliefs, and, if so, whether the department has shown that (1) it has an interest sufficiently compelling to justify that burden, and (2) the granting of an exemption to persons in Rasheed's position would unduly burden that interest. *Attorney Gen.* v. *Desilets, supra* at 322-325.[3]

B. *The Facts.*

While an inmate, Rasheed was provided with regular access to a Muslim chaplain, access to weekly worship services, access to religious education classes, the ability to pray five times each day using a prayer towel and prayer oil, the ability to conduct ablution prior to commencing daily prayers in his cell, a skull cap known as a kufi,[4] the ability to celebrate religious feasts and Ramadan, and access to religious books, including the Quran. In 1999, the department issued a Religious Service

---

[3]The department does not contend for summary judgment purposes that Rasheed's religious beliefs are not sincerely held.

[4]Muslim inmates are permitted to have a kufi in addition to the two hats permitted in the department's property regulation.

Handbook (handbook)[5] and, in 2001, promulgated a revised prisoner property regulation.[6] Rasheed claims that the enforcement of the guidelines set out in the handbook and of the property regulation deprive him of certain privileges and personal or religious property that he had previously been permitted. The evidence regarding those claims, viewed in its light most favorable to Rasheed, is set forth below.

1. *Eid meals.* Rasheed believes that his faith requires that he observe the Islamic festivals of Eid-al-Fitr by eating meat of budn (cows, oxen, or camel), and the festival of Eid-al-Adha by consuming hady (sacrificed cattle). Rasheed and other Muslin inmates are allowed to celebrate the two Eid festivals with special meals. From 1975 until 2000, Rasheed and others were allowed to purchase their own compliant food through private vendors for these meals, without security breach. However, this process resulted in problems and inefficiencies including: difficulties in locating local food vendors, screening the individual vendors for potential security risks, negotiating numerous contracts, disruptions in the supply of specialty food items, and an increased burden on department staff to search the incoming

[5] In order to process and accommodate the multitude of religious practice and religious property item requests made by inmates, and to provide for consistency throughout the prison system, the department developed a handbook as a reference tool to assist administrators when evaluating inmate religious requests. The handbook, issued in April of 1999, was the result of several years of collaborative work among the department's chaplains, administrators, outside religious experts, and the department's legal division. The policies outlined in the handbook are intended to be consistent with the health, safety, security, and fiscal constraints of the department.

[6] The commissioner amended the inmate property regulations through the formal promulgation process to add 103 Code Mass. Regs. § 403.10(9) (2001). That section provides: "A list of approved religious articles will be posted quarterly in the inmate libraries. If an inmate has a request for an item that is not on the list of approved religious articles, the inmate should submit his or her request to the Superintendent. The Superintendent will forward the request with a recommendation to the Religious Services Review Committee through the Director of Program Services for review. The Religious Services Review Committee consists of three Assistant Deputy Commissioners, the Director of Offender Management and Placement and the Director of Program Services. This committee shall meet on an as-needed-basis to review requests for religious articles that are not already approved for retention and shall forward their recommendations to the Commissioner for his approval."

Rasheed *v.* Commissioner of Correction.

food. In 1999, SBCC's Muslim chaplain purchased meats for the Eid festivals which were consistent with Rasheed's beliefs.

In 2000, the department contracted with a single food vendor, U.S. Foods, to provide the majority of food products for the prisons, allowing the department to control food quality better, increase efficiencies, ensure a consistent food supply, reduce burdens on staff required to process and search incoming food items, and reduce opportunities for contraband to be introduced into prisons through such items. Meals for the Eid festivals provided in 2000 and 2001 contained fish rather than beef. Subsequently, lamb was served at both festivals. Because Rasheed sincerely believes that he must consume budn and hady on these religious occasions, and that lamb and fish do not comport with those religious beliefs, he is forced to forgo proper observance of the festivals.[7]

2. *Personal property.* From 1975 to 2000, Rasheed possessed, without incident, various property items he contends are necessary to practice his religion. Possession of these items has since been restricted. Those restrictions were based on security concerns, including the need to reduce fire hazards, to reduce areas where inmates can hide contraband, to facilitate quicker and more thorough cell searches, and to reduce sanitation and housekeeping hazards. The following items are at issue:

a. *Prayer rug.* Rasheed's faith mandates he perform five daily prayers prostrate, in a purified area, completely separate from the impure floor by the use of a prayer rug. In order to reduce the amount and size of personal property contained in a cell, inmates practicing Islam are permitted to have a prayer towel instead of a prayer rug. Prayer rugs are much bulkier and heavier than prayer towels.[8] The thickness of the prayer rugs presented a fire and housekeeping hazard and made it easier for inmates to hide contraband within the rug, and more difficult to search. Prayer towels present less of a problem, and, from a

[7]There is a dispute in the record as to precisely what meats are consistent with traditional Muslim religious beliefs regarding these festivals. We do not resolve this dispute here.

[8]Rasheed alleges that prayer rugs are "larger" than prayer towels. However, the evidence in the record establishes that the prayer towel is a comparable size to the prayer rug.

sanitation perspective, can regularly be washed by the inmates.[9] Finally, in the department's judgment, if some inmates are permitted to have prayer rugs in their cells, other inmates would feel that those inmates were receiving preferential treatment and conflicts would result.

b. *Prayer oil.* Rasheed believes that he must purify himself prior to performing daily prayers and attending services. Part of the purification process is the application of prayer oil to both sides of his head and his body. Rasheed claims that he is unable to perform this obligatory ritual as the six prayer oils approved by the department cause an allergic reaction. Moreover, he alleges that the amount allowed (one ounce every three months) is inadequate.

The restriction placed on the types and quantity of prayer oil an inmate may possess is based on safety and security concerns. Because prayer oil is scented, inmates have used prayer oil for nonreligious purposes such as masking the odor of cigarettes or marijuana smoked in their cells or as a cologne when meeting visitors. Accordingly, prayer oil is a commodity valued by inmates resulting in illegal trading, strong-arming and theft. In addition, inmates are generally prohibited from possessing oil of any type because it may be used to lubricate wrists in order to escape from restraints, to make the cell floor slippery to prevent correction officers from readily extracting inmates from their cells, or to lubricate the body so that correction officers face difficulty in gaining control of inmates in cases of a planned assault or disruption. Oil can also be used by inmates to lubricate body cavities in order to hide contraband. As a result, the department determined that while inmates may continue to possess prayer oil for religious purposes, the quantity must be limited in order to deter inmates from using the oil for improper purposes. If used in moderation, a one-ounce container of prayer oil can last for up to three months. Additionally, the type of prayer oil fragrances that may be purchased were selected to

[9]Rasheed claims that washing a prayer towel with regular towels will impart impurities to it, making it unusable for the performance of the obligatory prayer. The record, however, supports the department's position that inmates have access to water and a wash basin so they may wash the prayer towel without compromising the religious integrity of the towel by its being washed with other towels.

deter the use of prayer oil as a mask for illegal substances or cologne and as a valued item for trading and strong-arming.

c. *Ablution pan.* Rasheed sincerely believes that he must wash his feet prior to praying. From 1975 to 2000, he kept a foot pan in his cell for the purpose of washing his feet. Pursuant to department property regulations, the foot pan was confiscated as excess personal property because Rasheed has access to a wash basin, water, soap, and a wash cloth in his cell for washing prior to prayers. Rasheed claims that the sink is inadequate because his feet are too large.

d. *Ihram cloth.* Rasheed believes that he is required to use an ihram cloth while performing the Hajj ceremony. That ceremony takes place in Mecca, Saudi Arabia, and has no religious significance outside of Mecca. The department determined that the ihram cloth constituted excess personal property because the ihram cloth is only used during a ceremony which Rasheed cannot attend.

e. *Gold Magic shaving powder.* Rasheed believes that his faith requires him to be clean-shaven, bald, and with a mustache. However, he suffers from a skin condition that prevents him from traditional shaving and must use a razorless hair remover to comply with his religious mandates. Prior to 1999, Rasheed utilized Gold Magic shaving powder to remove hair.

The department no longer allows the use of Gold Magic shaving powder because (1) it can be used to mask the presence of drugs in a routine urine drug screening, and (2) it is an abrasive — when mixed with water, it can be thrown into the face and eyes of staff, potentially causing a debilitating injury. The department does allow Gold Magic shaving cream to be purchased.[10] It is substantially the same as the powder. However, Rasheed alleges that the cream caused a rash when he used it.

3. *Prayer interrupted by the standing count.* Rasheed sincerely believes that he is obligated to pray at five specific times each day. While praying, Muslims move through several different positions which are held for a period of time. Each prayer is approximately five minutes and is to be conducted within a time period that lasts from one to several hours. The

---

[10]Inmates can also purchase other shaving products from the canteen.

department conducts visual standing counts of inmates in their cells four times daily: 7:10 A.M., 11:10 A.M., 4:20 P.M., and 9:30 P.M. Each standing count lasts from two to three minutes. Rasheed contends that the standing count occasionally conflicts with the times he prays, and that he should be exempt from standing for the count if he is in the middle of a prayer.

The department requires inmates to stand in their cells and face the cell door during the count to ensure that the correct inmate is present in the cell and that the inmate is alive and well. Inmates are not allowed to remain in their beds or lie on the cell floor during the count because an inmate attempting to escape could fashion clothing, blankets, and other objects to appear that he is sleeping, thus delaying discovery of the escape attempt. The department also requires inmates to face the cell door so that the staff can observe an inmate's face and physical appearance during the count for any physical problems such as bruises or cuts that may indicate a medical or security problem.

C. *Discussion.*

1. *Free exercise clause under art. 46 and the First Amendment.* In order to prevail on his claims, Rasheed must first demonstrate that the right to freely exercise his religious beliefs has been burdened. See *Attorney Gen.* v. *Desilets,* 418 Mass. 316 (1994). "[O]nly if a burden is established must the analysis move to the next step: a consideration of the nature of the burden, the significance of the governmental interest at stake, and the degree to which that interest would be impaired by an accommodation of the religious practice." *Curtis* v. *School Comm. of Falmouth,* 420 Mass. 749, 760 (1995). The degree of the burden necessary to trigger a further analysis of the department's justification for the regulations must be "substantial." *Id.* at 761. "[I]ncidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs [do not] require government to bring forward a compelling justification for its otherwise lawful actions." *Id.* at 762, quoting *Lyng* v. *Northeast Indian Cemetery Protective Ass'n,* 485 U.S. 439, 450-451 (1988).

With respect to the regulations that bar Rasheed from purchasing Gold Magic shaving powder, prevent him from keeping a

foot pan in his cell, and require that he stand during the four brief daily prison counts, Rasheed has failed to demonstrate a substantial burden on his religious freedoms. Such a burden must be more than a perceived or hypothetical one. It must have a tendency to coerce an individual into acting "contrary to [his] religious beliefs." *Attorney Gen.* v. *Desilets, supra* at 324. Here, there is no evidence that Rasheed cannot be clean shaven but for the use of Gold Magic shaving powder, or that he cannot wash himself in his cell before prayer without the foot pan, or that he cannot pray within the times proscribed by his faith if he complies with the standing count. These regulations neither limit him in the exercise of his religious beliefs nor coerce him to act contrary to those beliefs.

We agree with the motion judge that Rasheed's complaints regarding being permitted a prayer towel rather than a prayer rug, and limiting the variety and quantity of prayer oil available to him, also fail for the same reason.[11] Even though these items are used directly in a religious service, Rasheed has not established that the restrictions imposed by the department impede his ability to participate in that service according to his faith. The purpose of the prayer rug is to ensure that Rasheed is not in direct contact with the impurities of the floor when he prays. The record establishes that that purpose is satisfied by the use of a prayer towel that is comparable in size, other than thickness (an irrelevant characteristic) to a prayer rug. Similarly, the record establishes that the varieties of prayer oil permitted Rasheed are consistent with his faith and that a practitioner of that faith can properly spread the use of the quantity of oil allowed over a three-month period. Even, however, if we were to conclude that the department's regulations imposed a burden sufficient to require further analysis, that analysis would not lead us to agree with Rasheed.

It cannot be doubted that the department has a compelling interest in ensuring the safety of its staff and its inmates and the integrity of its institutions, *Cutter* v. *Wilkinson*, 544 U.S. 709,

---

[11]Rasheed's claim regarding his inability to possess an ihram cloth fails of its own weight. The record is undisputed that such a cloth has no significance in the exercise of Rasheed's religious beliefs except when participating in the Hajj religious ceremony in Mecca, Saudi Arabia.

722-723 (2005) (compelling interest standard to be applied with due deference to need to maintain order, security, and discipline in prison); Collins-Bey *vs.* Thomas, No. 03C2779 (N.D. Ill. Oct. 26, 2004) ("Ensuring safety within a prison is a compelling governmental interest"), or that that interest requires the prevention of weapons and contraband from coming into or being concealed in its facilities. This interest and its requirements are sufficiently compelling to justify the imposition of restrictions on property that inmates can acquire and possess while they are incarcerated, including restrictions on the availability of prayer rugs and prayer oil. The department need not wait until specific breaches of safety and security arise to take reasonable measures, such as these, based on the exercise of professional judgment, to guard against the undermining of its unusually important goals.

In balancing these restrictions and the compelling interests they further against the nature (and the context) of the burden on Rasheed's religious freedom, we note that the burden neither prevents any religious practice nor coerces a practitioner to act in violation of his faith. Moreover, there has been no showing that the accommodations, if any, that might need to be made by Rasheed to comply with these regulations (prudent use of oil or the hand washing of a towel) are of any religious consequence.

In sum, the department need go no further than it has gone to accommodate Rasheed's religious practices with regard to a surface upon which to pray and the prayer oils he may use. In reaching this conclusion, we are cognizant of the highly dangerous and volatile environment in which the department's goals of security and integrity must be met, and in that context, we agree that the department has adequately demonstrated that the additional exceptions sought by Rasheed unduly would hinder their fulfilment.

Finally, with regard to the Islamic festival meals to which Rasheed has been denied access, it is undeniable that prohibiting an inmate from acquiring the food that he believes he must consume to comply with his faith, has the tendency to coerce him to eat that which does not. This is a substantial burden that must be subjected to further analysis under the standard we have articulated.

For the reasons noted immediately above, prison officials must be permitted latitude in determining what products can come into the prison and what vendors can provide them. The department has established that limiting the number of food vendors, and principally dealing with only one, is necessary for a number of security and efficiency related reasons, including the preservation of precious staff resources otherwise required to process and search deliveries from multiple vendors. In this respect, the department has adequately met its burden to demonstrate not only a compelling interest, but also the undue burden and risk to that interest that would be created by permitting Rasheed, and others similarly situated, to purchase specialty foods from vendors other than U.S. Foods. What the department has not yet established, sufficient for summary judgment, is that the religious festival meals required by Rasheed's faith cannot be provided through its principal vendor. While the stated policy of the department, as set forth in the record testimony, is to provide Eid feast meals to Muslim inmates, through U.S. Foods, there is an inadequate record of the burden that would be incurred if the department sought to acquire meals consistent with Rasheed's faith in the same manner. Viewed under a standard of scrutiny greater than that applied by the motion judge, we reverse the entry of summary judgment on Rasheed's claim for injunctive and declaratory relief based on this deprivation.

2. *Massachusetts Civil Rights Act.* Rasheed also contends that the defendants violated his rights under the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H, 11I. The judge dismissed this claim, finding that Rasheed had failed to demonstrate a violation of his civil rights where the department policies were based on legitimate security interests and concerns. She also concluded that the record was devoid of facts demonstrating any cognizable threats, intimidation, or coercion applied in connection with the challenged policies. We agree.

3. *The Religious Services Handbook and 103 Code Mass. Regs. § 403.10(9).* Rasheed alleges that the handbook and 103 Code Mass. Regs. § 403.10(9), promulgated in 2001, violate G. L. c. 127, § 88, which provides in relevant part that an inmate "shall not be denied the free exercise of his religious

belief and the liberty of worshipping God according to the dictates of his conscience in the place where he is confined." The statute goes on to provide specifically, however, that it "shall not be construed as to impair the discipline of any such institution so far as may be needed for the good government and the safe custody of its inmates." In order for the guarantee of religious freedom, constrained by the reasonable and necessary requirements of security, to be properly implemented, the Legislature provided the commissioner, his deputies, and superintendents with the authority to establish policies, rules and regulations regarding inmate religious programs. See G. L. c. 124, § 1 (*q*); G. L. c. 124, § 2; G. L. c. 125, § 14. Pursuant to his authority, the commissioner promulgated 103 Code Mass. Regs. § 403.10(9), establishing departmental guidelines with respect to religious articles, and 103 Code Mass. Regs. §§ 471.00 (1998), establishing religious programs and services. In addition, consistent with his broad statutory authority, the commissioner prepared and established the handbook to serve as a tool and reference source for prison administrators and inmates. The handbook provides a process by which inmates can make specific requests through a religious services review committee (committee), consisting of several senior correction officials who review the requests for potential security concerns and make recommendations to the commissioner for a final determination.

We ordinarily accord an agency's interpretation of its own regulations considerable deference unless arbitrary, unreasonable, or inconsistent with the plain terms of the regulations themselves. *Warcewicz* v. *Department of Envt'l Protection*, 410 Mass. 548, 550 (1991). "So long as the agency's interpretation of its regulations and statutory mandate is rational, and adhered to consistently, it should be respected." *Boston Police Superior Officers Fed'n* v. *Boston*, 414 Mass. 458, 462 (1993).

Rasheed argues that the regulation and the handbook remove authority from the commissioner and the superintendents and place it with the committee, whereas 103 Code Mass. Regs. § 471.07(3) provides that only a "superintendent" or "designee" may limit access to religious programs, practices or services, thus making the recent restrictions on Rasheed's

religious practices and property unauthorized. However, by establishing the committee and giving it the authority to review and make recommendations, the commissioner has merely made the committee his "designee" in accordance with the plain language of the regulation. Moreover, under any interpretation of the regulations, the commissioner retains the power to make final decisions.[12] By developing the handbook, the commissioner not only provided guidelines for prison officials but also provided a mechanism for inmates to seek an exception, striking the balance between an inmate's needs and an institution's objectives specifically permitted by G. L. c. 127, § 88. In the absence of any evidence that the handbook, as applied to Rasheed, violates any applicable statute or constitutional provision, it is valid and in accord with relevant statutory and regulatory authority.

4. *Federal claims.* Rasheed also alleges violations of the Fourteenth Amendment to the United States Constitution contending that the defendants removed and destroyed his religious articles in contravention of his due process rights and denied him Eid meals and his ihram cloth in violation of the equal protection clause.

The due process rights of inmates are limited by the fact of confinement as well as by the legitimate goals and policies of the penal institution. *Bell* v. *Wolfish*, 441 U.S. 520, 545-546 (1979). The restrictions on the type and amount of personal property an inmate may possess are reasonably related to the penological goals of safety and security, and thus, the confiscation of property in excess of what was permitted did not violate Rasheed's right to due process.

Rasheed argues that he was subjected to unequal treatment because he does not have access to a Nation of Islam minister, his prayer times are interrupted by the standing counts, his ihram cloth was removed and he is denied Eid meals that

---

[12]Title 103 Code Mass. Regs. § 471.07(3) (1998) concludes with "all limitations of religious programs, practices and services will be documented via a letter to the associate commissioner." The commissioner thereby retains the authority to review any limitations and, if necessary, override the decision of the superintendent or his designee in accordance with the broad authority specifically provided to the commissioner with regard to management of the Commonwealth's prisons, including religious services. See G. L. c. 124, § 1.

conform to his sincere beliefs. Rasheed failed to raise a claim regarding access to a minister in his complaint, and it is therefore waived. Otherwise, the evidence in the record is not sufficient to establish that Rasheed was subject to disparate treatment, or that any differences in his treatment were the result of a discriminatory intent. Rasheed's equal protection claims, therefore, fail as a matter of law.

5. *Qualified immunity.* Because we affirm summary judgment for the defendants on all of Rasheed's claims except those related to his meals, we need only address his claims for money damages against the defendants on that subject. In *Ahmad* v. *Department of Correction, post* 479 (2006), we determined that qualified immunity was proper where prison officials acted to limit the alternative meals available to Muslim inmates (pork-free and vegetarian) on the reasonable belief that such limitations were lawful at the time. The issues and the time period in question in that case and this, are sufficiently similar for us to conclude that entry of summary judgment for the defendants here would have been proper on qualified immunity grounds. Where we find an adequate alternative ground on which to affirm summary judgment, we may proceed to do so. See *Massachusetts Highway Dep't* v. *Smith,* 51 Mass. App. Ct. 614, 621 (2001).

The summary judgment for the defendants is affirmed in part and reversed in part. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*