Moriartv, Cornelius J., J.
INTRODUCTION
Plaintiffs, Randall Shield Wolf Trapp (Trapp), an inmate at Massachusetts Correctional Institute (MCI) Norfolk, a medium security facility, and Robert Ferreira (Ferreira), an inmate at Souza Baranowski Correctional Center (SBCC), a maximum security facility, brought this action against the Commissioner of the Department of Correction (DOC), Gary Roden (Roden) and Cynthia Sumner (Sumner) the Superintendent and Deputy Superintendent, respectively, of MCI-Norfolk.[3]
In their Amended Complaint, Trapp and Ferreira, Native American spiritual practitioners, allege that the defendants breached a Settlement Agreement (SA) entered into on February 14, 2003 between Trapp and the then Commissioner of Correction (Count I); breached the implied covenant of good faith and fair dealing inherent in the SA (Count II); violated their constitutional right to the free exercise of religion as guaranteed by the First Amendment to the United States Constitution (Count III); violated their constitutional right to the free exercise of religion as guaranteed by Article II of the Massachusetts Declaration of Rights (Count IV); violated their constitutional right to the free exercise of religion as guaranteed by the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §2000 cc(a)(I)-(2) (Count V); violated their constitutional right to the free exercise of religion by denying them their ability to purchase authentic Native American religious regalia pursuant to 18 U.S.C. §1159 and 25 U.S.C. §305e (Count VI) and violated their federal civil rights as guaranteed by 42 U.S.C. §1983 (Count VII).
BACKGROUND
On or about April 12, 1995, Trapp, a prisoner lawfully committed to the custody of the DOC, along with four other plaintiffs[4] brought suit in the Worcester Superior Court Civil Action No. 1995-0779 against the DOC and four other defendants,[5] alleging they were denied their right to religious freedoms. After lengthy litigation, the parties entered into the SA on February 14, 2003.
On September 30, 2010, Trapp brought the instant action alleging that the defendants had violated the SA. On November 5, 2010, Trapp amended his complaint adding Ferreira as a plaintiff and asserting the seven counts as herein above set forth.
The defendants moved to dismiss the complaint in its entirely pursuant to Mass.R-Civ.P. 12(b)(6). In their motion to dismiss, the defendants argued that (1) there was no breach of the SA; (2) Ferreira lacked standing to enforce the agreement; (3) declaratory relief was inappropriate; and (4) the plaintiffs failed to exhaust administrative remedies before bringing their civil rights claims.
On February 18, 2011, another judge of this court (Curran, J.) allowed the motion to dismiss as to Ferreira’s claims for breach of contract (Count I) and breach of the implied covenant of good faith and fair dealing (Count II). The court also barred the plaintiffs from seeking damages on all counts on the basis that they had failed to exhaust their administrative remedies pursuant to G.L.c. 127, §38F.[6] At oral argument on the Motion to Dismiss, the defendants also argued that the issues in the litigation were moot. Consequently, the court invited the parties to submit memoranda on the issue of mootness.
The defendants subsequently filed a second Motion to Dismiss on the issue of mootness, which was denied by the court on April 4, 2011.
In their Amended Complaint, the plaintiffs seek a declaratory judgment that the defendants breached the SA by (1) withholding tobacco from them for use during prayer and purification ceremonies; (2) forcing them to purchase non-authentic Native American religious regalia from DOC vendors; (3) refusing to allow *461 the plaintiffs to practice their religion in accordance with the traditions of the Wampanoag tribe; and (4) violating their rights pursuant to the federal and state constitutions, 42U.S.C. §2000cc-l(a)(l)-(2), 18U.S.C. §1159 and 25 U.S.C., §305e, and 42 U.S.C. §1983.
The plaintiffs also seek an order for specific performance compelling the defendants to honor the terms of the SA. Finally, the plaintiffs seek injunctive relief enjoining the defendants from withholding tobacco from the plaintiffs for prayer and ceremonial use and enjoining the defendants from allowing the third party vendor from selling the plaintiffs non-authentic Native American religious regalia.
Trial was held before the undersigned on July 16, 2012 through July 18, 2012. Based on the credible evidence and the reasonable inferences drawn therefrom, the following findings of fact and rulings of law are made.
FINDINGS OF FACT
The Parties
Trapp is a prisoner in the custody of the DOC and at all times relevant confined to MCI-Norfolk. Ferreira is a prisoner in the custody of the DOC. Ferreira had previously been confined to MCI-Norfolk, but in February 2012 was transferred to SBCC. The inmates are practitioners of Native American spiritualism. The defendant, Howard Clarke (Clarke) formerly served as the Commissioner of the DOC. Roden is the Superintendent of MCI-Norfolk and has served in that position since October 2008.
The Settlement Agreement
In 1995, Trapp brought suit against the then Commissioner of the DOC, Larry Dubois, alleging violation of his religious freedoms. On February 14, 2003, a settlement of that litigation was reached. Pursuant to the terms of the SA, the DOC agreed that Native American Purification Lodges (Lodges) would be constructed and ceremonies conducted once a month at the North Central Correctional Institution, MCI-Norfolk, and SBCC, where the named inmates were then housed. It was also agreed that other inmates who participated in Native American religious practices could participate in the Lodge ceremonies.
Incorporated into the SA were written protocols (the Protocols) entitled “Protocols for the Construction and Operation of Native American Purification Lodges Within the Massachusetts Department of Correction” detailing the manner by which the Lodges were to be constructed and the ceremonies conducted. Both the construction of the Lodges and the ceremonies were to be based on the traditions of the Wampanoag Tribe. The SA provided that the Protocols could be altered, as needed, to facilitate the Lodge ceremonies and as security needs dictated and in consultation with the Massachusetts Commission on Indian Affairs.
The Religious Practices
As per the Protocols, the Lodges at the designated institutions were to be located within a secured perimeter inaccessible to the general inmate population. The Lodges are dome like structures constructed of sixteen saplings arranged in a circle and affixed to the ground. The saplings are bent and joined together to form a dome. Medicine bundles containing kinnick-kinnick are tied to the outside of the sapling frame. During the ceremony, the frame is covered with tarps and blankets. A pit is dug, in the middle of the Lodge, to accommodate rocks which are heated during the ceremony.
Pursuant to the SA, Lodge ceremonies were to be conducted once per month. Each ceremony was to be supervised by an approved outside volunteer of the same sex as the inmate participants. Typically 15-20 inmates participated in the Lodge ceremonies.
The ceremony is designed to sweat out impurities both physical and spiritual. To that end, a wood fire is started in a fire pit by a “Fire Tender” outside of the Lodge. Approximately twenty large rocks are heated in the fire pit and then transferred into the Lodge by use of a shovel. Inside the Lodge, deer antlers are used to arrange the rocks. Water is poured on the rocks to create steam and heat.
In anticipation of the Lodge ceremony, a Smudge ceremony (Smudge) first takes place. A Smudge is a cleansing ceremony during which a mixture of sage, cedar and sweet grass is ignited in a Smudge bowl, typically a conch shell. The holder of the Smudge bowl then passes among the participants with a small fan and fans smoke on each.
Following the Smudge and upon entry to the Lodge, which is said to represent the mother’s womb, the participants sit in a circle and offer prayers to the Creator and the ancestral spirits. During this ceremony, a communal pipe with kinnick-kinnick is smoked within the Lodge. Kinnick-kinnick is a mixture of dry herbs, bark and tobacco. Tobacco is regarded by Native American spiritual practitioners as a sacred herb and as a corridor of communication with the creator and ancestral spirits. According to Trapp, without tobacco, there can be no communication with either the creator or the ancestral spirits.
Actions Taken to Curtail Religious Activities The Lodges
Pursuant to the SA, Lodges were constructed at both SBCC and MCI-Norfolk. Within six months, the outdoor Lodge ceremonies at SBCC were discontinued as a result of excessive smoke filtering into the building from the wood fire used to heat the rocks. SBCC has a closed ventilation system and no windows. Asthmatics working or residing within the institution complained of respiratory distress which led to the decision to halt the outdoor Lodge ceremonies. Since that date no outdoor Lodge ceremonies have been *462 available to practitioners at the SBCC. Although the SA provided that the alteration of ceremonies was to be done in consultation with the Bureau of Indian Affairs there is no credible evidence to suggest that any such attempt was made.
Lodge ceremonies were temporarily halted in June 2011 at MCI-Norfolk when the Native American volunteer James “Raven” Farnham was suspended for violation of DOC policies. For some time prior to June 2011, Farnham was the volunteer who oversaw the Lodge ceremonies at MCI-Norfolk. Since Famham’s suspension, the DOC’s Director of Volunteer Services, William Milhomme, has made diligent efforts to locate a replacement but met with little success. To date, he has been able to locate only one volunteer, a resident of Lenox, Massachusetts., approximately 90 miles west of SBCC.
The requirement of a volunteer to supervise the Lodge ceremony satisfies an important security concern. During the Lodge ceremony the Lodge frame is covered with blankets and tarps and the interior of the Lodge is not visible to.prison guards. The presence of a volunteer guards against the possibility of sexual misconduct and attacks on other inmates, since the implements used in the ceremony, such as the rocks, shovels and deer antlers, could easily be fashipned into weapons by any inmate bent on doing harcn to. another.
Kinnick-Kinnick
In 2005, the DOC stopped providing kinnick-kinnick with tobacco and substituted tobacco free kinnickkinnick, an act which the plaintiffs alleges breached the SA. The DOC’s decision was based on the provisions of G.L.c. 270, §22, which prohibits smoking in “any public building, except in an area which has been specifically designated as a smoking area, as well as, 103 DOC 444.00[7] et seq. and 103 DOC 203.00 which prohibit inmates and staff from the use and possession of all tobacco products on DOC property.
The DOC defended its- decision to halt the supply of the kinnick-kinnick with tobacco in 2005 on the basis that kinnick-kinnick is not defined in either the SA or the Protocols and thus there is no requirement that kinnick-kinnick contain tobacco. However, I am not so persuaded. I find that it was agreed, and understood, by the parties to the SA that the kinnick-kinnick provided for the outdoor Lodge ceremonies would contain tobacco. No better evidence of that intent can be demonstrated than by the fact that the DOC provided kinnick-kinnick with tobacco to the Native American spiritual practitioners for two years following the execution of the SA. Moreover, the 2002 DOC handbook defined kinnickkinnick as a blend of tobacco, bark, roots, sage and sweet grass. Finally, I find that the smoking of kinnick-kinnick with tobacco is consistent with the traditions of the Wampanoag Tribe.
The DOC also maintains that it stopped providing kinnick-kinnick with tobacco, as it considered it contraband and a threat to security. I credit the DOC’s position that tobacco is a highly sought after commodity in the prison environment and may, in some circumstances, pose a threat to security. However, the amount of tobacco in kinnick-kinnick is small and different than commercial grade tobacco. Moreover, the supply is controlled by the Director of Treatment and there have been no reported disciplinary incidents regarding its unauthorized use or distribution.
Prayer Ceremonies
As an accommodation to the inmates, the DOC permits the practitioners to hold twice weekly prayer ceremonies in the Battle Room, which is located in the Community Service Building at MCI-Norfolk. The Community Service Building hosts meetings for all of the seventeen recognized religions including such diverse groups as Catholics, Muslims,-Jews, Quakers, Scientologists, and Wiccans. It provides chaplains to those members of the Catholic, Muslim, Protestant and Jewish faiths.
The Native American ceremonies consist of a talking circle, singing, chanting and the playing of musical instruments, including drums, rattles and a flute. A correctional officer conducts a security check while making rounds at the building. During this indoor ceremony practitioners are allowed to smudge and smoke the pipe with kinnick-kinnick without tobacco.[8] The DOC has installed an exhaust fan to vent the smoke generated by the pipe smoking. In addition, the DOC now permits outdoor pipe ceremonies during which the participants are allowed to smoke the ceremonial pipe with kinnick-kinnick with tobacco.[9] In connection with the pipe ceremonies, both indoors and out, the DOC provides the plaintiffs with a communal prayer pipe, a smudge bowl and a talking stick.
Restrictions on Colors
The plaintiffs also allege that they are not allowed access to prayer bead colors of their choice which have a special significance to the traditions of the Wampanoags. Based on the testimony of both Trapp and Ferreira, which I credit, the colors yellow, red, black and white have special meaning as they represent the four seasons and four directions. However, the DOC permits only the purchase of brown, black or white beads. This decision, I find, is based on valid security concerns as I credit the testimony of Superintendent Roden that certain colors are identifiers of both national and local violent street gangs, such as the Latin Kings (yellow), the Crips (blue) and the Bloods (red). These gangs, known to be well represented within prison walls, have a demonstrated antipathy toward one another and present a genuine security threat to one another.
DISCUSSION
While the inmates pursue a variety of claims against the facilities, their claims share a common foundation. They complain primarily of (1) the previous policy banning all tobacco from the facilities, and preventing the inmates from using it in religious ritu *463 als, from 2005-2010 (“the tobacco ban”); (2) the current policy restricting prayer ceremonies to outdoor locations when they include tobacco, so they can be supervised by corrections officers (“the smoking restrictions”); (3) the discontinuation of the Lodge ceremonies at the sweat lodges (“the sweat lodge closures”); and (4) the ban on certain colors of prayer beads (“the color restriction”).
COUNT ONE — BREACH OF CONTRACT
The parties correctly agree that the SA is properly treated as a contract. In construing the language of a contract, “a court should, so far as reasonably practicable, give a construction which will make it a rational business instrument and will effectuate what appears to have been the intention of the parties.” Hurtubise v. McPherson, 80 Mass.App.Ct. 186, 190 (2011), and cases cited.
Language in the SA reflected an intention to circumscribe the facilities’ obligations in a way that would preserve their security. Specifically, the SA included a proviso that the Wampanoag protocols would yield to the security concerns of the facilities where the two priorities came into conflict. More importantly, the facilities, like all correctional institutions, have “a compelling interest in ensuring the safety of [their] staff and [their] inmates and the integrity of [their] institutions.” Rasheed v. Comm’r of Corr., 446 Mass. 463, 473-74 (2006), and cases cited. No correctional institution could rationally enter into an agreement that would impair the safety and security it exists to preserve.[10] Accordingly, the court will not construe the SA to require the facilities to take actions that would compromise their security.
Threats to Security
Consequently, the sweat lodge closure at MCI Norfolk, following the expulsion of the volunteer supervisor for purification ceremonies, was not a breach of the SA. Without such a supervisor, the environment inside the sweat lodge could be used to enable violence or other misconduct by inmates, which would be an undeniable threat to security. MCI-Norfolk has undertaken, and continues to undertake, reasonable efforts to locate a substitute supervisor, so that the purification ceremonies may resume. Those efforts are sufficient to discharge its obligations under the SA.
Similarly, the SA does not require that MCI-Norfolk allow prayer rituals indoors, or in other environments that would present legitimate security risks. Because the prayer ceremonies incorporate kinnick-kinnick, which itself includes tobacco, they must be closely monitored to ensure that participants do not smuggle tobacco into the general population. As noted above, tobacco is a valuable commodity in the prison environment and illicit trade in the substance would undermine security. See generally Cryer v. Clark, Civil Action No. 09-10238, 2009 WL 6345768, *8 (Jul. 9, 2009) (acknowledging tension between security and presence of tobacco in prison environment).
Officials from MCI-Norfolk credibly testified that the prison’s resources only permit adequate supervision of the prayer ritual when it is held outdoors, where the environment affords fewer opportunities for inmates to conceal kinnick-kinnick on their persons. The court will defer to MCI-Norfolk’s credible assessment of its security requirements. See generally Cutter v. Wilkinson, 544 U.S. 709, 722-23 (2005). The smoking restrictions are not a breach of the SA.
Breaches of the SA
The tobacco ban was a breach of the SA. First, the terms of the SA expressly provide for access to kinnick-kinnick that includes tobacco. While the court must construe the SA in a manner that allows it to function as a rational business instrument, the court cannot override the significance of the plain language of the SA. See 275 Washington Street Corp. v. Hudson River Int’l, LLC, 81 Mass.App.Ct. 418, 426 (2012). The facilities, well familiar with their security needs and the potential difficulties tobacco might create, nonetheless agreed to provide kinnick-kinnick that included tobacco to the inmates.
Second, the evidence before the court does not convincingly show that there is no way to allow tobacco within the facilities and maintain security. Indeed, the facilities themselves distributed kinnick-kinnick with tobacco until 2005, and resumed such distribution in 2010. The bare assertion that the presence of tobacco, in any form, creates an unmanageable security problem at the facilities is insufficient. Cf. Werner v. McCotter, 49 F.3d 1476, 1480 (9th Cir. 1995) (“[T]he state must do more than simply offer conclusoiy statements that a limitation on religious freedom is required for security . . .”). For these reasons, the facilities were in breach of the SA when the tobacco ban was in effect.
In addition, SBCC’s sweat lodge closure was a breach of the SA. Unlike MCI-Norfolk, which ended the ceremonies for security-related reasons, SBCC’s reasons were limited to health concerns associated with exposing staff and inmates to smoke created during the ceremonies. I find this argument unconvincing. First, the evidence in support of this proposition consisted of hearsay statements, which themselves offered dubious self-diagnoses, such as asthma, without any medical foundation. Second, the facilities have provided no reason to believe that the only feasible means of remedying the smoke inhalation problem was breaching the SA by stopping the purification ceremonies altogether. The facilities have said nothing to explain why filtering the air inside the building affected, or moving the sweat lodges to another location that would disperse the smoke in another direction, will not suffice.
*464 COUNT TWO — BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
“Not every breach of contract... is a breach of the implied covenant of good faith and fair dealing.” T.W. Nickerson, Inc. v. Fleet Nat’l Bank, 73 Mass.App.Ct. 434, 447 (2009). While the facilities may have acted in breach of their obligations under the SA, I do not conclude that the facilities’ breach was a deliberate action taken for the purpose of destroying the inmates’ right to receive the fruits of the SA. See Curtis v. Herb Chambers I-95, Inc., 458 Mass. 674, 680 (2011).
Instead, the facilities curtailed the inmates’ access to religious items based on safety, health, and resource-related concerns. While those factors may not have justified all of the facilities’ departures from the protocols set forth under the SA, they also reflect an attempt to perform under the SA in good faith. This is particularly evidenced by the facilities’ decision to resume distributing kinnick-kinnick with tobacco in 2010. Thus, no breach of the implied covenant of good faith and fair dealing occurred. ■
COUNT THREE — VIOLATION OF THE PLAINTIFF’S FIRST AMENDMENT RIGHT TO THE FREE EXERCISE OF RELIGION
Notably, the facilities’ First Amendment obligations here are less stringent than some of those imposed under the SA. The facilities made explicit promises concerning specific types of religious expression in the SA, whereas “an inmate’s right to exercise his religion is preserved as long as he is not ‘deprived of all forms of religious exercise.’ ” Bailey v. Rubenstein, Civil Action No. 2:08-CV-01204, 2009 WL 1024614 *4 (S.D.W.Va. Apr. 15, 2009), quoting O’Lone v. Estate of Shabazz, 482 U.S. 342, 352 (1987). “Accordingly, the relevant question ... is whether . . . inmates practicing Native American religions ‘retained the ability to participate in other [Native American] religious ceremonies.’ ” Id., quoting O’Lone, 482 U.S. at 352.
Here, there can be no question that the inmates are afforded some opportunities to practice their religion. They are allowed to participate in prayer ceremonies, and smoke kinnick-kinnick. The limitations placed on these religious exercises are justified by the facilities’ “compelling governmental interest to control the introduction of contraband, to include tobacco products, into the inmate population.” Id. Further, the facilities “must consider the costs associated with the use of staff/officers, space availability, and time factors in the administration of any program, religious or otherwise.” Id.
In addition, the inmates further complain of additional limitations imposed on their religious exercises, beyond the alleged breaches of the SA, such as the color restriction. The inmates contend that the color restriction prevents them from expressing their spirituality. The facilities imposed the color restriction to control activities related to membership in violent prison gangs. This consideration is plainly related to valid security concerns at the facilities.
Because the color restriction, along with the other measures discussed above, are “reasonably related to legitimate penological interests,” Farrow v. Stanley, Civil Action No. 02-0567, 2005 WL 2671541, *9 (D.N.H. Oct. 20, 2005), quoting O’Lone, 482 U.S. at 349, the inmates’ First Amendment claims fail.
COUNT FOUR — VIOLATION OF THE PLAINTIFFS’ CONSTITUTIONAL RIGHT TO THE FREE EXERCISE OF RELIGION AS GUARANTEED BY ARTICLE II OF THE DECLARATION OF RIGHTS OF THE MASSACHUSETTS CONSTITUTION
“[T]he scope of protection afforded the right to freely exercise one’s religion under the Massachusetts Constitution is greater than that afforded by the United States Constitution.” Rasheed, 446 Mass. at 467. For the inmates to prevail on their Article II claim, they must show (1) that the facilities have imposed a “substantial burden” on the free exercise of their sincerely held religious beliefs; (2) that the facilities do not have a sufficiently compelling interest to justify that burden; and (3) that applying an exemption to the inmates to allow their religious expression would not unduly burden the facilities’ compelling interest. Id.
As discussed above, the facilities’ interest in preserving safety and security is sufficiently compelling to justify burdens on the inmates’ religious expression. Compare id. at 474 (interest in maintaining security “sufficiently compelling to justify the imposition of restrictions on [religious] property that inmates can acquire and possess while they are incarcerated”).
Thus, the facilities have the right to regulate the inmates’ access to tobacco and items that can be used to display gang colors. Similarly, the sweat lodges, while unsupervised, present a clear security risk that the facilities need not accept. Any exemption from these policies would unduly burden the facilities’ interest in preserving safety. See id. (“The department need not wait until specific breaches of safety and security arise to take reasonable measures, such as these, based on the exercise of professional judgment, to guard against the undermining of its unusually important goals”).
Conversely, SBCC’s sweat lodge closure, not justified by security-related concerns but premised instead on unconvincing references to health concerns, was not predicated on a compelling interest of the facilities. Thus, the inmates are entitled to prevail on Count IV to the extent that it is based on the SBCC sweat lodge closure.
COUNT FIVE — VIOLATION OF THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT
To prevail on their claim under the Religious Land Use and Institutionalized Persons Act (“RLUIPA”), 42 *465 U.S.C. §2000cc-1 et seq., the inmates must show that the facility imposed a substantial burden on the exercise of their religious freedoms. Bailey, 2009 WL 1024614, at *8. If the inmates succeed in making such a showing, then the facilities “must prove that the policies are in furtherance of a compelling governmental interest and are the least restrictive means of furthering that compelling governmental interest.” Id.
As discussed above, even assuming that the limitations on the inmates’ religious expression amount to a substantial burden, that burden is justified by the facilities’ compelling interest in preserving safety and security. What remains, then, in the context of the inmates’ RLUIPA claim, is to determine if those limitations are the least restrictive means of achieving that interest.
Regulation of Native American smoking rituals, limiting those activities to approved times and places to promote security, has withstood scrutiny under the RLUIPA. See, e.g., Skenandore v. Endicott, Civil Action No. 05-C-0234, 2006 WL 2587545, *13 (E.D.Wis. Sept. 6, 2006). The presence of tobacco is a recognized security risk in the prison environment, and the RLUIPA is to be construed and applied with “due deference to the experience and expertise of prison and jail administrators in establishing the necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.” Id. quoting Cutter, 544 U.S. at 722-23. Farther-reaching bans of tobacco than those applied here have been deemed consistent with the RLUIPA. Id. at *4-5. However, outright bans of tobacco have not been accepted. Thus, the unqualified ban on tobacco from 2005-2010 constituted a violation of the RLUIPA, but the other restrictions on its use do not.
In addition, the bead color restrictions are the least restrictive alternative available to limit gang activity. In the context of RLUIPA analysis, other courts have recognized that limiting religious expression is an appropriate measure to control gang activity. See id. at *16 (Native American drum circles regulated to control gang activity without violation of RLUIPA). “[P]rison officials’ security concerns regarding the ‘gang’ colors . . . comprises a compelling security interest outweighing plaintiffs right to perform the particular religious practice.” Jones v. Rowley, Civil Action No. 08-1094, 2009 WL 7042244, *4 (D.Md. Apr. 20, 2009).
Furthermore, the SBCC sweat lodge closure was, for the reasons explained above, not the least restrictive alternative to resolving the alleged health problems its operation caused. Therefore, the SBCC sweat lodge closure was, likewise, a violation of the RLUIPA.
COUNT SIX — VIOLATION OF 18 U.S.C. §1159 AND 25 U.S.C. §305E
The first statute under which the plaintiffs bring claims, 18 U.S.C. §1159, does not provide for a private right of action. It is a criminal statute prohibiting the misrepresentation of goods and items as Indian-produced. Courts “have generally been reluctant to infer a private cause of action from a statute in the absence of some indication from the Legislature supporting such an inference.” Loffredo v. Ctr. for Addictive Behaviors, 426 Mass. 541, 544 (1998). Consistent with that principle, the claim under 18 U.S.C. §1159 must fail because no private right of action is provided for in the statute.
The second statute under which the plaintiffs proceed, 25 U.S.C. §305E, also known as the Indian Arts and Crafts Act, limits private rights of action to the Attorney General, Indian tribes, Indians, or Indian arts and crafts organizations. 25 U.S.C. §305E(d)(1), et seq.; Native Am. Arts, Inc. v. Contract Specialties, Inc., 754 F.Sup.2d 386, 389 (D.R.I. 2010). The inmates cannot claim a private right of action as attorneys general, Indian tribes, or Indian arts and crafts organizations. Furthermore, there is insufficient evidence before the court to conclude that the inmates are themselves Indians. Consequently, their claims under the statute must fail, because they have no private right of action.
COUNT SEVEN — VIOLATION OF 42 U.S.C. §1983
An action under 42 U.S.C. §1983 will succeed if the facilities, under color of state law, deprived the inmates of rights secured by the U.S. Constitution or federal law. Mancuso v. Mass. Interscholastic Athletic Ass’n, Inc., 453 Mass. 116, 123 (2009). Because the tobacco ban and the SBCC sweat lodge closure deprived the inmates of rights secured by the First Amendment and the RLUIPA, the inmates are entitled to prevail on their cause of action under §1983.
Consistent with the terms of the statute, the inmates are entitled to apply for an award of attorneys fees in connection with the claims on which they prevailed. However, the inmates are cautioned to distinguish their claimed attorneys fees carefully from the other causes of action on which they were not successful.
ORDER
For the foregoing reasons, judgment shall enter in favor of the plaintiffs on Counts I, IV, V of the Amended Complaint as follows.
The plaintiffs are entitled to judgment on Count I insofar as the facilities breached the SA by instituting the tobacco ban from 2005-2010, and by closing the SBCC sweat lodge.
The plaintiffs are entitled to judgment on Count IV insofar as the facilities violated their right to the free exercise of religion, secured by Article II of the Massachusetts Declaration of Rights, by instituting the tobacco ban from 2005-2010 and by closing the SBCC sweat lodge.
The plaintiffs are entitled to judgment on Count V insofar as the facilities violated the Religious Land Use and Institutionalized Persons Act by instituting the tobacco ban from 2005-2010 and by closing the SBCC sweat lodge.
*466 It is DECLARED and ADJUDGED that the facilities violated the plaintiffs’ rights as detailed above.
Judgment shall enter in favor of the defendants on all remaining counts of the Amended Complaint.
Consistently with the terms of 42 U.S.C. § 1983, the plaintiffs shall have twenty (20) days from today’s date to submit a written motion for attorneys fees supported by detailed billings and affidavits. If requested by either party, and deemed necessary by the court, a hearing on the issue of the award of attorneys fees will be scheduled thereafter.

 The plaintiffs will be referred to collectively as “the inmates.” The defendants will be referred to collectively as “the facilities.”

 William Wiyakaska (f.n.a. Durfee), James Crow Feather Manley, Bernard R. Barby, Sr. and Christopher Bousquet.

 Lany E. Dubois, John Marshall, Peter J. Chalapatas and Michael Dorian.

 Section 38F. An inmate shall not file any claim that may be the subject of a grievance under section 38E unless the inmate has exhausted the administrative remedy established pursuant to said section 38E; but the court may consider such claim if a final administrative resolution of a grievance filed pursuant to said section 38E has not been decided within 180 days from the date of filing such a grievance, or if the inmate can demonstrate to the court that exigent circumstances exist which, if delayed pursuant to the requirements of this section, would jeopardize the life or seriously impair the health of the inmate, or, for actions seeking equitable relief.

 The DOC policy at issue here, 444.01 Inmate Smoking provides:
The smoking, possession or other use of tobacco products by inmates is prohibited on all Department of Correction property, and properly under the control of the department.

 At trial, the plaintiffs offered testimony that they were not allowed to meet as often as adherents of other religions such as Catholics or Muslims. However the complaint does not allege a violation of equal protection clause and, accordingly, I consider such evidence irrelevant to the issues before me.

 In November 2010, the DOC reversed field and changed its 2005 policy to permit Native American spiritual practitioners to use kinnick-kinnick with tobacco, for use in outdoor ceremonies only.

 The Inmates suggest that the overriding consideration in interpreting the SA is its reference to the religious traditions of the Wampanoag tribe. That argument is entirely without merit. The SA makes clear that the opposite is true, and safety considerations should prevail over fidelity to Wampanoag traditions.